# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 4, 2010 Session

## STATE OF TENNESSEE v. JERRY TATE

### Direct Appeal from the Criminal Court for Shelby County
### No. 07-03130      W. Otis Higgs, Judge

### No. W2009-01474-CCA-R3-CD  - Filed June 10, 2010

The defendant, Jerry Tate, was convicted by a Shelby County Criminal Court jury of second degree murder and sentenced to twenty years in the Department of Correction. On appeal, he challenges the sufficiency of the convicting evidence. After review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Gerald S. Green, Memphis, Tennessee (on appeal); Robert C. Felkner and Kindle E. Nance, Assistant Public Defenders (at trial), for the appellant, Jerry Tate.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and Corliss Shaw and Muriel Malone, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the shooting of the victim, Walter Nelson, on Dunlap Street in Memphis in October 2006, as a result of which the defendant was indicted on one count of second degree murder. At the defendant's trial, Charlene Frierson testified that the victim was her son and identified photographs of him for the record.

Patrick Bolton testified that the victim was one of his best friends, and they were together on October 20, 2006, when the victim was killed by the defendant. Bolton

explained that he and the victim were walking on Dunlap Street and saw the defendant run inside a house and "c[o]me out real fast" with his arm behind his back. Bolton approached the defendant, asking if he had any marijuana. The defendant did not respond, so Bolton walked away and "tried to catch the dude down the street" who Bolton had just sent "to get [them] some weed." As Bolton turned away from the defendant, he heard the defendant tell "another guy to come here. And the dude came to [the defendant] and when [Bolton] turned back around [the defendant] just shot [the victim]." Bolton stated that the defendant shot the victim with "a chrome .38" and that although it was dark outside, the street lights illuminated the area.

Bolton testified that when the defendant pulled the gun, Bolton ran toward a pay phone to call 911. Bolton listened to the recording of the 911 call and recalled that he told the "police that Jerry had just shot [his] partner." Bolton said that he returned to the scene and told the police what had happened. He also gave a description of the shooter to the police because he did not know the defendant's name at the time. Bolton went to the police station that night and identified the defendant from a photographic array.

Bolton testified that the night before the shooting, the victim and the defendant's girlfriend "got into a conflict" when he and the victim were walking past what he presumed was the defendant's house on Dunlap Street. After the argument, the defendant exited his house, and he and the victim "stood there and looked at each other for a minute" before Bolton and the victim left.

On cross-examination, Bolton admitted that he only knew the defendant's name because the police told him the night of the shooting. Bolton also admitted that even though the victim was his best friend and roommate, he had trouble remembering his last name. Bolton said that he and the victim were on Dunlap Street that night looking for marijuana, but he denied smoking any marijuana that night. Bolton stated that he currently took the medication, Risperdal, for paranoid schizophrenia and had taken it the night of the shooting. Asked if he smoked marijuana and took his medication, Bolton responded, "Like I said, I didn't smoke that much."

Bolton said that he never gave a physical description of the shooter to the police; the police "had pictures of people who I thought could have been the shooter." Bolton admitted that on the photographic array in which he identified the defendant, he wrote, "I think this is the guy that shot my friend." He explained, "The picture and seeing him is two different things, because I could see him and point him out, but the picture, it's like kind of throwing him off a little bit." Bolton admitted that he pled guilty to robbery in 2003 and served fifteen months in jail. He also admitted that he was currently in jail.

On redirect, Bolton testified that he functions normally when he takes his medication. Bolton said that when he circled the photograph of the defendant on the array, he was certain that he was the shooter, but the photograph made the defendant look a different age.

Officer Billy Byrd with the Memphis Police Department testified that he responded to a shooting call in the area of North Dunlap Street on October 20, 2006. Officer Byrd arrived on the scene about thirty seconds after receiving the call and observed the victim lying in front of a vehicle. The victim was crawling, trying to get under the front end of the vehicle when Officer Byrd approached. The victim said, "I've been shot, I've been shot, it was the mother fucker down the street that shot me." Officer Byrd looked down the street and saw two or three individuals standing on the porch of a house under a porch light.

Officer Byrd testified that he stayed at the scene and helped secure possible witnesses. A witness gave a description of the shooter and said "he was down the street at . . . the dope house." Officer Byrd said that the officers were aware of "the dope house" and that it was about four houses down from the victim's body.

On cross-examination, asked if there was more than one drug house in that area, Officer Byrd said, "To my knowledge on that street there were none other. I know there are others in the area." Officer Byrd said that he was not provided the name of a suspect by the victim or the witness. He said that the individuals who had been standing on the porch at the house down the street went inside and would not answer the door.

Sergeant Christopher Kee with the Memphis Police Department testified that he responded to the shooting call in the case on October 20, 2006. At the scene, Sergeant Kee spoke with Bolton and got a description of the suspect from him. Bolton also pointed out the house the suspect exited to Sergeant Kee. The address of that house was 688 North Dunlap, and it was three or four houses down from the victim's body. Sergeant Kee received information that the house was occupied by Mamie Tate and "occasionally her . . . adult son, who is [the defendant]." On cross-examination, Sergeant Kee testified that Bolton did not inform him that he was on medication for a mental illness but said that he "[s]eemed fine to [him]."

Sergeant Ronald Collins with the Memphis Police Department testified that he responded to the scene in this case as a member of the homicide department. Sergeant Collins transported Bolton to the police station and took a statement from him. Bolton related that the shooting stemmed from an incident that had occurred the night before at a house down the street from where the shooting took place. The officers developed the defendant as a suspect from researching the address of that previous incident.

Sergeant Collins testified that Bolton identified the defendant from a photographic array, but he told the officers that "the photograph didn't really look like the guy that he saw the night before." Sergeant Collins explained that "it may have been an old photograph that [they] had in the spread," and the witnesses were informed that the photographs might be old and the subjects' features may have changed. Sergeant Collins tried unsuccessfully for a few days to locate the defendant before having a warrant issued based on Bolton's statement and identification. The defendant was arrested on that warrant sometime later.

On cross-examination, Sergeant Collins testified that Bolton informed the officers that he was disabled, but Sergeant Collins did not inquire further because Bolton seemed to fully understand everything that was said.

Dr. Lisa Funte, the Shelby County Medical Examiner, testified that she performed the autopsy on the victim in this case and determined that the cause of death was multiple gunshot wounds. Dr. Funte said that the gunshot wounds to the victim's left buttocks and right arm were potentially fatal, and the victim would have died within a few minutes from the gunshot wound to the upper left side of his chest. The toxicology results reported the presence of alcohol in the victim's system but no drugs. The blood alcohol and vitreous fluid levels indicated that the victim had consumed alcohol recently before his death but not enough to be considered legally intoxicated. Dr. Funte stated that she recovered intact bullets from the buttocks and chest wounds, bullet fragments from the arm wound, and an additional intact bullet from the victim's clothing. She determined that the victim had been shot with a medium caliber weapon, which could be "[a]nything besides a .22, or .25, or a .44."

Charlie Jackson, who was presently incarcerated for drug-related charges, testified that he had been housed in the same area of the jail as the defendant. Jackson explained that three weeks prior, he and the defendant were playing cards or dominoes when the defendant "asked [Jackson] about a situation that he was in . . . and he was telling [Jackson] about the case that he was involved in." According to Jackson, the defendant told him that

> he was in front of his mother's house and a guy pulled up and was talking to his girlfriend, Birdie Campbell[,] and him and [the] guy got to arguing . . . and the guy left and came back the next day and wanted to buy some weed from him. And he told the guy to hold on and he'll be right back. He went in the house and got a hoodie and a .38 revolver and he shot the guy in the butt and he fell to the ground and he shot him in the chest and then turned around and shot him in the shoulder.

-4-

Jackson testified that the defendant told him that he "removed the hoodie and the revolver" from his mother's house after the police started canvassing the neighborhood. Jackson stated that he had not heard anything about this incident prior to talking to the defendant. Jackson said that he wrote a letter to his attorney after he learned this information from the defendant. Jackson stated that he had not been promised anything for his testimony, and he had already been sentenced on his convictions. On cross-examination, Jackson acknowledged that he had a "lengthy" criminal record.

Bradley Humes, who was presently incarcerated, testified that he and the defendant were cell mates for about five months. Humes recalled that the defendant told him that he was in jail because of a murder that happened outside of his mother's house on Dunlap Street. The defendant told Humes

> that the guy that got killed was arguing with his girlfriend and he came out and started arguing with him, too. And he said that after the argument, the guy that was with the one that got killed was trying to calm the situation down and stop everything and they left and came back the next day trying to buy marijuana. And after they was trying to buy marijuana he said, [the defendant] said he said, I got some weed and he went in the house and put on a fleece, or hoodie and came back out with a .38 revolver and shot him three times.

Humes recalled that at first the defendant did not say whether he had committed the murder or was just charged with the murder, but after they "bonded," the defendant admitted that he was responsible. The defendant told him that the name of the person he shot was "Walter," the person with "Walter" was "Patrick," and "Patrick" ran after the first shot was fired. According to Humes, the defendant told him that after the shooting, "[the defendant] went in the house and wrapped the gun up and took the hood off and . . . left." Humes said that he contacted an officer in the homicide department with this information. Humes stated that he was not promised anything in exchange for his testimony.

On cross-examination, Humes testified that he was presently in jail because he had been charged with two aggravated burglaries, aggravated robbery, burglary of an automobile, and failure to appear in a felony case. Humes said that he and the defendant talked about the defendant's case "a lot," the first time being "a couple of months ago." Humes stated that he did not tell anyone this information initially because he and the defendant were cell mates and "it would have brought conflict to [their] cell."

After the conclusion of the proof, the jury convicted the defendant as charged of second degree murder.

## ANALYSIS

The defendant challenges the sufficiency of the convicting evidence, arguing that "the convicting testimony consisted of a drunken or high on marijuana paranoid schizophrenic 'eyewitness' who later identified the [defendant] from a photo spread and the testimony of two jailhouse snitches." He asserts that the eyewitness identification was unreliable and jailhouse informants untrustworthy.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant cites to studies dealing with the unreliability of eyewitness identifications and argues that Bolton's identification of him was unreliable because Bolton was on medication for paranoid schizophrenia, smoked marijuana, and said, "I think this is

the guy that shot my friend" when he made the identification from the photographic spread. However, Bolton testified that he had not smoked marijuana the night of the murder and that he functions normally when he takes his medication. Sergeant Kee testified that he was not informed that Bolton was on medication but noted that he "[s]eemed fine" when he spoke to him. Likewise, Sergeant Collins said that Bolton seemed to fully understand everything that was said. Bolton testified that he was certain that the defendant was the shooter but explained that he was confused by his photograph. Sergeant Collins testified that Bolton was informed that the photographs in the array may be old and the subjects' features changed. All the testimony was heard and assessed by the jury, and the jury determined that Bolton was credible and reliable in his identification of the defendant.

As another attack on Bolton's credibility, the defendant points out that Bolton initially testified that he called 911 and reported that "Jerry had just shot [his] partner," and then later testified that he did not know the defendant's name when he made the 911 call. This discrepancy was also assessed by the jury. Moreover, it is conceivable that Bolton, now knowing the defendant's name, had simply become accustomed to utilizing his name instead of a vague reference when recalling the events.

The defendant also challenges the trustworthiness of Charlie Jackson's and Bradley Humes's testimony, both of whom testified that the defendant confessed to them, because they are jailhouse informants. However, it was fully brought to the jury's attention that both men were presently incarcerated, their criminal records, and why they came forward with this information. The jury assessed this testimony and found them credible, as was its province. The defendant further insinuates that Jackson, Humes, and Bolton may have conspired together because "[a]ll three men had been housed at the Shelby County Jail." The defendant provided no proof to support this allegation.

The defendant's entire argument is essentially an attempt to have this court reassess the credibility of the witnesses and substitute that finding for that of the jury's. However, as previously stated, all questions involving the credibility of witnesses and the weight and value to be given the evidence were resolved by the jury as the trier of fact. See Pappas, 754 S.W.2d at 623.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE